UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
THE PLAN COMMITTEE,             )
                                )
          Plaintiff,            )
                                )
     v.                         )     Civil Action No. 02-1487 (RWR)
                                )
PRICEWATERHOUSECOOPERS,         )
LLP,                            )
          Defendant.            )
_____ )

MEMORANDUM OPINION AND ORDER

_____Plaintiff, established by the United States Bankruptcy Court

for the District of Columbia to oversee bankruptcy proceedings on

behalf of the unsecured creditors of the Greater Southeast

Healthcare Providers ("Greater Southeast"), filed a two-count

diversity action against defendant PricewaterhouseCoopers, LLP

("PWC") alleging that defendant negligently conducted its

independent audits of Greater Southeast's accounts and breached

its contract to provide for Greater Southeast accounting and

audit services in compliance with the Generally Accepted Auditing

Standards and Principles.  Defendant filed a motion to dismiss on

four grounds arguing that (1) plaintiff lacks capacity to sue

under Federal Rule of Civil Procedure 9; (2) plaintiff fails to

state a negligence or breach of contract claim under Rule

12(b)(6); (3) the claims are barred by Greater Southeast's

contributory negligence; and (4) the claims are barred by the

statute of limitations notwithstanding tolling agreements signed by plaintiff and defendant.  Because plaintiff has set forth claims upon which relief may be granted, defendant's motion to dismiss will be denied.  Because plaintiff has standing to sue under the Bankruptcy Code but lacks capacity to sue, but has stated that it would move to join another party who does have capacity to sue, plaintiff will be granted leave to move to amend its complaint to substitute a party with capacity to sue as plaintiff.

BACKGROUND

Defendant provided auditing and accounting services during the 1990's to Greater Southeast, a group of healthcare providers and administrative offices, before Greater Southeast filed for bankruptcy in 1999.[1]  (Compl. ¶¶ 3, 11, 17.)  Defendant conducted annual audits of Greater Southeast's financial statements for 1995, 1996, 1997 and 1998, and prepared annual "Reports of Independent Auditors," purporting to have conducted those audits in conformity with Generally Accepted Auditing Standards

---

[1]    Greater Southeast Healthcare Providers encompasses the Greater Southeast Community Hospital Foundation, Greater Southeast Management Company, and the Fort Washington Nursing Home, each of which filed for bankruptcy collectively.  (Compl. ¶ 3.)

- 3 -

("GAAS").[2]  (Id. ¶¶ 19, 21.)  Plaintiff alleges that defendant

acknowledged that an audit conforming with GAAS would reasonably

assure that the audit was free of material misstatements, and

that it would have been conducted after defendant had "examine[d]

the evidence, assess[ed] the accounting principles, review[ed]

significant estimates, and otherwise evaluate[d] the overall

presentation of [Greater Southeast's] financial statements."

(Id. ¶ 21.)  Plaintiff asserts that defendant, contrary to its

representations, failed to conduct its audits in accordance with

GAAS for audit years 1995 through 1998 by preparing reports which

materially overstated Greater Southeast's "net realizable value."

(Id. ¶ 26.)

     The inflated net realizable value, plaintiff contends,

resulted from defendant's failure to account for Greater

Southeast's accounting practices in which net revenue was

accrued.  (See id. ¶ 24.)  Although Greater Southeast's hospitals

collected payments after services had been rendered by later

billing their patients, net revenue was recorded at the time

services were delivered.  (Id.)  Those services were in large

part then billed to third party payors in amounts above the

_____

[2]     Plaintiff alleges that defendant conducted an audit for
Greater Southeast's finances for 1998, but failed to issue a
Report.  (Compl. ¶ 20.)

- 4 -

amount for which the third party payors would be responsible.  As
a result, without accurately reflecting the difference between
the amounts charged and the actual amounts received, Greater
Southeast's accounts receivable balances were overstated, or "not
presented at 'net realizable value.'"  (Id. ¶¶ 25-26.)

When defendant conducted its audits of Greater Southeast's
finances, plaintiff states that defendant should have -- but
failed to -- scrutinize the hospitals' accounts receivable
balances.  (Id. ¶ 31.)  According to plaintiff, established audit
practices required defendant to "take into account [Greater
Southeast's] internal controls, underlying contractual
arrangements, post collection history, and subsequent collection
experience" to determine whether Greater Southeast's accounts
realizable balances accurately reflected the net realizable
value.  (Id.)  Because defendant failed to note the difference
between the net realizable value and the accounts receivable
balances, plaintiff contends that Greater Southeast "did not
discover the nature and severity of its financial situation"
until it could not avoid insolvency and bankruptcy.  (Id. ¶ 49.)
Plaintiff alleges that if defendant had "complied with its
professional standards of care with respect to its audits, . . .
[Greater Southeast] would have taken actions to avoid insolvency

- 5 -

and bankruptcy" because Greater Southeast would have recognized its financial troubles.  (Id. ¶¶ 50, 51.)

Plaintiff asserts that defendant should have noted that Greater Southeast's financial statements were overstated because defendant had audited a number of clients in the healthcare industry which had similar accounting practices; had been responsible for Greater Southeast's debt refinancing in 1993 which should have made the defendant familiar with Greater Southeast's financial structure; and because in 1997 a third party purchased only some of Greater Southeast's accounts receivables, an indication, plaintiff alleges, that Greater Southeast's statements were inaccurate.  (Id. ¶¶ 34, 35, 39.)  As a result of defendant's failure to discover the misstatements, plaintiff alleges that Greater Southeast's net operating income was overstated by $27 million for years prior to 1998, and that Greater Southeast was not made aware of "the nature and the severity of its financial situation until early in 1999."  (Id. ¶ 49.)  Greater Southeast filed for bankruptcy in 1999 under Chapter 11 of the United States Bankruptcy Code.  (Id.; see In re The Greater Southeast Community Hosp. Found., Inc., et al., 237 B.R. 518 (Bankr. D.D.C. 1999).)

Under the Second Amended Joint Plan ("Plan") of liquidation for the bankruptcy proceedings of Greater Southeast, approved by

- 6 -

the bankruptcy court in a Confirmation Order in 2001, plaintiff
was established to "[c]ommence, prosecute, and if appropriate,
settle all causes of action vested on behalf of creditors . . .
and prosecute all causes of action of the Debtors' Estates, the
Committee, the Plan Committee, or on behalf of the creditors of
an Estate generally," among other responsibilities.  (Pl.'s Opp'n
to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") Ex. 4 ("Second Am.
Plan") at 45.)  The Plan required that the Plan Committee consist
of three members of the Committee of Unsecured Creditors, and
granted it the responsibility to "pursu[e] . . . all litigation
which is intended to result in recovery to the General Claim
Fund" for the creditors.  (Id. at 46.)  The Plan provided for the
Plan Committee to "retain and . . . enforce for the sole and
exclusive benefit of creditors pursuant to the terms of [the
Plan] any claims, rights and causes of action that the respective
Estates, the Committee, or creditors as a group, may hold against
any Person."  (Id. at 47.)  As the purported successor to the
Creditor's Committee formed before and dissolved after the Plan
was confirmed, plaintiff executed an agreement with defendant
pursuant to plaintiff's putative authority from the Confirmation
Order and the Plan to toll any unexpired statutes of limitations
on causes of action plaintiff could have brought against the
defendant.  (Pl.'s Opp'n at 28; Def.'s Mem. in Supp. of Mot. to

- 7 -

Dismiss ("Def.'s Mot.") at 34.)   The agreement was extended four times to July 31, 2002.   On July 26, 2002 plaintiff filed its two-count complaint, alleging in Count I professional negligence and audit malpractice based on defendant's alleged failure to exercise appropriate care and competence in reviewing and auditing Greater Southeast's finances for 1995 through 1997, and in Count II breach of contract based on defendant's failure to audit Greater Southeast's finances from 1995 through 1999 in conformity with GAAS.   Plaintiff seeks compensatory damages of $70 million on each count.

Defendant filed a motion to dismiss, arguing that the Plan Committee does not have the capacity to sue under Rule 9, that the claims fail as a matter of law under Rule 12(b)(6), that plaintiff was contributorily negligent such that it is precluded from recovering damages from defendant, and that the purported tolling agreements are void, rendering plaintiff's claims time barred by the statute of limitations.   Plaintiff opposes.

DISCUSSION

I.   STANDING

Defendant states briefly, without citing legal authority, that "the Plan Agent is the sole trustee, and under applicable law it is the trustee who has standing to sue on behalf of a trust, not a board of advisors such as the Plan Committee . . .."

(Reply Mem. of P. & A. of Def. PricewaterhouseCoopers in Supp. of Mot. to Dismiss ("Def.'s Reply Mem.") at 9.)  Because any recovery here would go to the Plan Agent, defendant argues that plaintiff lacks standing to bring those claims which would benefit directly only the Plan Agent.  "[B]ecause standing is jurisdictional under Article III . . ., it is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 156 (2d Cir. 2003) (internal quotation omitted).

Under the Bankruptcy Code, a trustee of a bankruptcy estate "stands in the shoes of the [bankrupt debtor] and has standing to bring any suit that [the bankrupt debtor] could have instituted had it not petitioned for bankruptcy."  Id. (internal quotation omitted); see also 11 U.S.C. § 541 (2000) (deeming "all legal or equitable interests in property as of the commencement of the case" property of the estate); id § 323(b) ("The trustee in a case under this title has the capacity to sue and be sued."). Although typically only the trustee has standing to pursue claims on behalf of the bankrupt debtor, some circuits have interpreted the Bankruptcy Code and the equitable purposes of bankruptcy law to authorize derivative standing on creditors' committees under

- 9 -

limited circumstances.  For instance, a "creditors' committee may acquire standing to pursue the debtor's claims if (1) the committee has the consent of the . . . trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." In re Commodore Int'l Ltd., 262 F.3d 96, 100 (2d Cir. 2001); see also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 566, 568 (3d Cir. 2003) (en banc) ("We believe that the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers.").  Derivative standing allows parties "to pursue valuable actions when the [party with direct standing or express statutory authorization to have standing] unreasonably refus[es]" to bring suit.  See Chinery, 330 F.3d at 568.  By extension, some courts have allowed creditors' committees to pursue those valuable actions with the permission of the trustee, even if the trustee has not refused to bring suit.  See id. at 568-69 (exhaustively examining Bankruptcy Code sections 1109(b), 1103(c)(5), and 503(b)(3)(B), and the role of creditors' committees in bankruptcy proceedings, to hold that the committees have standing to pursue actions on behalf of the

debtor).[3]  In addition, the committee must demonstrate to a court

that its claims are both in the best interest of the estate, and

necessary and beneficial to the bankruptcy proceedings.  Without

such a finding, the committee may lack derivative standing and

authority to bring suit in court.

Plaintiff obtained the consent of the Plan Agent, as

successor in interest to the debtor, to "further examine/pursue

claims against [Greater Southeast's] prepetition auditors."

(Def.'s Mot. Ex. C ("Emergency Mot. of the Official Comm. of

Unsecured Creditors") at ¶ 12; Def.'s Mot. Ex. C  (Debtors'

Response) at ¶ 1 ("The Debtors do not oppose the Committee's

request for authority to bring the causes of action.").)  In

---

[3]   Plaintiff states that "the instant action belongs to the
debtor entities in this bankruptcy," implying that the suit is
brought on behalf of the debtors.  (Pl.'s Opp'n at 9.)  Later, it
states that it is not "bringing this action for its own benefit,
but rather, for the benefit of others, i.e., the unsecured
creditors."  (Id. at 11.)  While derivative standing for a
creditors' committee is necessary to bring suit on behalf of the
debtor, the analysis may be different if the plaintiff is
asserting that the cause of action is one brought on behalf of
the unsecured creditors.  "Whether a right of action belongs to
the debtor or to the individual creditors is a question of state
law."  Official Comm. of Unsecured Creditors v. R.F. Lafferty &
Co., Inc., et al., 267 F.3d 340, 348 (3d Cir. 2001).  However,
any argument that the negligence claim -- which accrued during
Greater Southeast's viability as a business -- is a cause of
action that belongs to the creditors is unlikely to hold water.
"The . . . assertion that this action will benefit creditors is
not an admission that this action is being brought on their
behalf."  Id. at 349 (quoting In re Jack Greenberg, Inc., 240
B.R. 486, 506 (Bankr. E.D. Pa. 1999)).

addition, although the Bankruptcy Court did not expressly find
that this litigation would be necessary and fair to the
bankruptcy, it granted the Creditors' Committee "immediate
authority and formal standing to . . . prosecute . . . causes of
action arising out of the Damages Actions . . .." (Def.'s Mot.
Ex. C (Order of Apr. 2, 2001) at ¶ 2; see also Emergency Mot. of
the Official Comm. of Unsecured Creditors at 1 (defining Damages
Actions to include a cause of action against Greater Southeast's
pre-petition auditors).) The court found "that there [was] just
cause to grant to the Committee the relief [it] sought" (Def.'s
Mot. Ex. C (Order of Apr. 2, 2001) at 1), based on the Creditors'
Committee's representation in its motion that "there is a
probability that it will obtain a valuable recovery on the
Damages Actions [and] . . . that pursuing the Damages Actions is
beneficial to the estate and for unsecured creditors."
(Emergency Mot. of the Official Comm. of Unsecured Creditors at
¶ 29.) In any event, a potential recovery of $70 million as
plaintiff requests in its complaint, weighed against the costs of
litigation, would suggest that the case could be in the best
interest of the bankruptcy estate and necessary and fair to
Greater Southeast's bankruptcy proceedings. Plaintiff has
established the requirements necessary to gain derivative
standing to pursue this action.

- 12 -

II.  CAPACITY TO SUE

Defendant also challenges under Federal Rule of Civil Procedure 9[4] plaintiff's capacity to sue in this court as an unincorporated association, which lacks capacity to sue under District of Columbia law.[5]  Plaintiff counters that it is not an unincorporated association, and that it has capacity to sue because it was established by the Bankruptcy Code which, by operation of the Supremacy Clause of the United States Constitution, vests it with capacity to sue.  Plaintiff also asserts that it may sue because it is a "fiduciary" -- which has putative authority under District of Columbia law to bring suits

---

[4]   Under Rule 9(a), a party may challenge a party's capacity to sue "by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."  Fed. R. Civ. P. 9(a).

[5]   The common law of the District of Columbia is that an unincorporated association may not be sued in its own name.  See Pritchett v. Stillwell, 604 A.2d 886, 889 (D.C. 1992).  An unincorporated association is a "collection of persons united for collective purpose generally formed under common law of contract[.]"  Id. (citing 7 C.J.S. Associations §§ 4-6 ).  Because an unincorporated association is not recognized as a juridical entity in the District of Columbia, "[t]he general rule is that . . . [it] must bring the action in the names of its individual members."  7 C.J.S. Associations § 41.
        Although plaintiff states that it is not an unincorporated association, it proffers only that it may be a "fiduciary" and provides no other guidance as to what other District of Columbia law may give it the status of a juridical entity able to sue.

- 13 -

-- with a duty to bring causes of action on behalf of the debtor

and unsecured creditors.

"Capacity has been defined as a party's personal right to

come into court, and should not be confused with the question of

whether a party has an enforceable right or interest or is the

real party in interest."  Bd. of Educ. of the City of Peoria v.

Illinois State Bd. of Educ., 810 F.2d 707, 709-710 (7th Cir.

1987) (quoting 6 C. Wright & A. Miller, Federal Practice and

Procedure § 1559).  Rule 17 provides in relevant part that

"capacity [of a party that is not an individual or a corporation]

to sue or be sued shall be determined by the law of the state in

which the district court is held[.]"  Fed. R. Civ. P. 17(b).

Therefore, to proceed in this court on state common law claims,

as plaintiff does here, a party may have the capacity to sue only

if the law of the District of Columbia permits it to sue.  See

Busby v. Electric Utilities Employees Union, 323 U.S. 72, 74

(1944); D.C. Super. Ct. R. Civ. P. 17(b).

A.   Supremacy Clause and Preemption of State Law

"In determining whether a state statute is pre-empted by

federal law and therefore invalid under the Supremacy Clause of

the Constitution, [the] sole task is to ascertain the intent of

Congress."  California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S.

272, 280 (1987).  Article I, § 8 of the Constitution vests

- 14 -

Congress with the authority to establish uniform bankruptcy laws
and where "Congress has chosen to exercise [that] authority,
contrary provisions of state law must accordingly give way."  In
re Princeton-New York Investors, Inc., 219 B.R. 55, 59 (D.N.J.
1998) (citation omitted).  There is a "basic assumption that
Congress did not intend to displace state law" in the bankruptcy
context, rebutted only by "either explicit, or compelled
[preemption] due to an unavoidable conflict between the state law
and the federal law."  Id. at 60 (internal citations omitted).

"In enacting the [Bankruptcy] Code, Congress expressly
incorporated Federal Rule of Civil Procedure 17(b) into the
bankruptcy scheme."  Id. at 64 (noting that Bankruptcy Rule 7017
requires Bankruptcy Courts to apply Rule 17(b) to adversary
proceedings); see also Davis v. Davis, 194 F.3d 570, 579 (5th
Cir. 1999) (noting same).  Thus, while a creditors' committee may
"sue in its common name for the purpose of enforcing for or
against it a substantive right existing under the Constitution or
laws of the United States," it may not sue for state law causes
of action unless the state confers it with the capacity to sue.
Fed. R. Civ. P. 17(b)(1).  In addition, Congress specified the
duties and powers of creditors' committees in sections 1102 and
1103 of the Bankruptcy Code, 11 U.S.C. §§ 1102-1103, but never
stated that it was overriding state laws governing capacity to

sue.  It cannot be said, therefore, that Congress expressly

intended to preempt state statutes defining capacity to sue.  To

the contrary, Congress expressly incorporated into the bankruptcy

scheme the Federal Rules's deference to state capacity to sue

statutes for state causes of action.

Nor does a Bankruptcy Court's authority to permit creditors'

committees to bring derivative suits on behalf of a bankrupt

estate confer an otherwise incompetent party with capacity to

sue.  While bankruptcy courts, as courts of equity, have been

held to have the authority to permit suits by creditors'

committees as a matter of standing, see, e.g., In re Commodore,

262 F.3d at 100, plaintiff points to no authority establishing

that bankruptcy courts may override state capacity to sue

statutes.  Cf. Kelly v. Robinson, 479 U.S. 36, 49 (1986) (stating

that federalism concerns should influence interpretation of the

Bankruptcy Code).  A creditors' committee, conferred with

standing by a bankruptcy court, may under Rule 17(b)(1) sue in

its common name for the purpose of enforcing a federal

substantive right.  Where, however, the cause of action is a

creation of the state, a party may pursue that cause of action in

federal court, consistent with the Supremacy Clause, only if that

state confers it with the capacity to do so.

B.   Fiduciary

Plaintiff argues alternatively that it may sue in its common name under District of Columbia law "because it is a fiduciary bringing a legal action in its fiduciary capacity."  (Pl.'s Opp'n at 10.)  Plaintiff contends that a fiduciary may sue in its fiduciary capacity under District of Columbia law, citing Parsons v. Hill, 15 App. D.C. 532, 545 (1900), and that, as an "assignee for the benefit of creditors," plaintiff may sue in its own name here as a fiduciary to the creditors and ultimately the bankruptcy estate.[6]  (Id. at 11.)

Although Parsons contains language that it is "not only [a fiduciary's] right, but perhaps his duty to sue[,]" it does not stand for the broader proposition that a party otherwise without the capacity to sue may sue in its common name merely because it acts as a fiduciary.  15 App. D.C. at 545.  While District of Columbia law defines a fiduciary -- in the limited context of security transfers -- as an "executor, administrator, trustee,

---

[6]    Plaintiff likewise asserts that District of Columbia Superior Court Rule of Civil Procedure 17(c) permits it to sue in its own name as a "committee . . . or other like fiduciary" which may sue or defend "on behalf of [an] infant or incompetent person."  Superior Court Rule 17(c) does not, however, grant carte blanche authority for a fiduciary acting on behalf of any party other than an infant or incompetent to sue in its own name. Plaintiff does not contend that it sues on behalf of an infant or incompetent person.

guardian, committee, conservator, curator, tutor, custodian, or nominee[,]" nothing in that definition, or in the chapter defining a fiduciary's duties with respect to fiduciary security transfers, grants a fiduciary the capacity to sue regardless of its form.  28 D.C. Code § 2901(4) (2001).  Likewise, District of Columbia defines a fiduciary generally to include an "assignee for the benefit of creditors, . . . or other person acting in a fiduciary capacity for a person, trust or estate."  21 D.C. Code § 1701(a).  A "person" as used in that definition includes a "corporation, partnership, or other association, or two or more persons having a joint or common interest . . .."  Id.  Although that chapter of the D.C. Code describes the types of deposits and transfers that a fiduciary may make -- and any attendant liability and responsibility that may accrue -- there is no language which gives a "fiduciary" the status to sue in its own name.  Cf. 28 D.C. Code § 2101 et seq. (describing the duties of an "assignee for the benefit of creditors" and the proceedings that may be instituted by creditors, but failing to state that all "assignees," whatever their form, have the capacity to sue in the District of Columbia).

The notable absence of language expressly conferring a fiduciary with the capacity to sue stands in contrast to the rights set forth in the D.C. Code for a corporation.  The D.C.

Code explicitly sets forth that "[e]ach corporation shall have

power . . . [t]o sue and be sued, complain and defend, in its

corporate name." 29 D.C. Code § 101.04(2). Similarly, a

partnership is defined as "an entity distinct from its partners"

and may sue in its own name in the District of Columbia. 33 D.C.

Code § 102.01 (as amended). Prior to 1996, a partnership was not

recognized by statute as a distinct legal entity, but rather

"only a contractual status. Suits affecting partnership matters

[then] must [have been] brought by or against the members of the

firm." Marmac Investment Co., Inc. v. Wolpe, 759 A.2d 620, 622

n.1 (D.C. 2000) (internal quotation omitted). Only once the

definition of partnership was amended did it gain the capacity to

sue under District of Columbia law.

Accepting plaintiff's argument would render the definition

of fiduciary, and any attendant duty to take certain actions, a

catch-all "capacity to sue" statute under District of Columbia

law. Without any indication that the District of Columbia

intended that result, and given the multiple Code provisions

containing express language which confers entities with legal

status, it remains that an entity -- whether a fiduciary or not

-- must be recognized as one with the capacity to sue to bring

any action.[7]  See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452

(2002) ("[W]hen Congress includes particular language in one

section of a statute but omits it in another section . . ., it is

generally presumed that Congress acts intentionally and purposely

in the disparate inclusion or exclusion.") (internal quotation

omitted).

        C.   Amending the Complaint

        Plaintiff alternatively seeks leave to amend its complaint

to add the names of the members of the Committee as plaintiffs.[8]

(Pl.'s Opp'n at 11.)  In a related context, the Federal Rules of

Civil Procedure state that "[n]o action shall be dismissed on the

ground that it is not prosecuted in the name of the real party in

interest until a reasonable time has been allowed after objection

----

[7]    This does not mean that a fiduciary that lacks capacity to
sue is barred from pursuing actions in its fiduciary capacity.
That party must, however, pursue that action in the names of the
members who constitute the party.  Cf. Wright & Miller, Federal
Practice & Procedure § 1564 (noting difference between having a
cause of action and capacity to sue).

[8]    Defendant states for the first time in its reply to
plaintiff's opposition to its motion to dismiss that the
Committee is not properly constituted and that the Plan Agent,
and not plaintiff, is the sole trustee of the creditors' causes
of action.  (Def.'s Reply Mem of P. & A. in Supp. of Mot. to
Dismiss at 6, 7.)  Because there may be a set of facts upon which
plaintiff may show that it is properly constituted and the real
party in interest under Rule 17(a) (see, e.g., Compl. ¶ 8; Fed.
R. Civ. P. 12(b)(6)), defendant's factual challenge does not
alter the analysis.

- 20 -

for ratification of commencement of the action by, or joinder or substitution of, the real party in interest[.]"  Fed. R. Civ. P. 17(a).  Because amending the complaint would serve the ends of justice, Fed. R. Civ. P. 15(a), plaintiff will be granted leave to amend its complaint "by joining or substituting the entity or entities that ultimately are the real parties in interest in this case with the capacity to sue."  James Creek Marina v. Vessel My Girls, 964 F. Supp. 20, 22 (D.D.C. 1997) (granting plaintiff 20 days to amend the complaint because it lacked capacity to sue as a physical location); see also Link Aviation, Inc. v. Downs, 325 F.2d 613, 615 (D.C. Cir. 1963) (finding that Rule 17(a) failure "did not deprive the suit of a status which enabled the insurers to substitute themselves as plaintiffs and continue the suit in their own names in compliance with Rule 17(a)").

III. MOTION TO DISMISS

Defendant argues that plaintiff's professional negligence and breach of contract claims should be dismissed because plaintiff failed to allege adequately the essential elements of each claim.  Specifically, defendant asserts that plaintiff failed to (1) allege that defendant owed plaintiff a duty of care; (2) identify a breach of that duty; (3) allege proximate cause; and (4) specify damages.  Defendant also argues that the breach of contract claim "survives to the extent that [the

negligence] counts survive the motion to dismiss and fails to the extent that those counts fail" (Def.'s Mot. at 27 (quoting Shapiro, Lifschitz & Shram, P.C. v. Hazard, 24 F. Supp. 2d 66, 81 (D.D.C. 1998)), and thus the contract claim should be dismissed for failure to allege the four essential elements as well.

A motion to dismiss for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) should be granted only where it appears that there is no set of facts in support of the claims which would entitle a plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The complaint must be construed in the light most favorable to the plaintiff and "the court must assume the truth of well-pleaded allegations." Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004). In a complaint, a plaintiff need supply only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), and is not required to "set out in detail the facts upon which he bases his claim." Conley, 355 U.S. at 47; Warren, 353 F.3d at 39, 40 (noting that "many well-pleaded complaints are conclusory," that specific facts are not required to survive a motion to dismiss under Rule 12(b)(6), and that Federal Rule of Civil Procedure Form 9 permits conclusory allegations of negligence.) In addition, any "ambiguities or uncertainties

concerning the sufficiency of the claims must be resolved in
favor of the plaintiff." Conservative Club of Washington v.
Finkelstein, 738 F. Supp. 6, 7-8 (D.D.C. 1990) (citing Hughes v.
Rowe, 449 U.S. 5, 10 (1980)).

A.   Negligence Claim

Under District of Columbia tort law, "[t]he elements of an
action for professional negligence are the same as those of an
ordinary negligence action.  The plaintiff bears the burden of
presenting evidence which establishes the applicable standard of
care, demonstrates that this standard has been violated, and
develops a causal relationship between the violation and the harm
complained of." Battle v. Thornton, 646 A.2d 315, 319 (D.C.
1994) (citation and internal quotation marks omitted).  In sum, a
plaintiff in a negligence action must set forth a duty of care,
breach of that duty, proximate causation, and damages.  District
of Columbia v. Cooper, 483 A.2d 317, 321 (D.C. 1984).

1.   Duty of Care

Although plaintiff alleges "violations of some fairly
general auditing standards (Compl. ¶¶ 40-41) and also alleges
that [defendant] had a duty to 'exercise appropriate care and
competence within the professional standards of care' (Compl.
¶ 53)," defendant contends that plaintiff's failure to allege to
whom defendant owed that duty and why is fatal to plaintiff's

claim.  (Def.'s Mot. at 17, 18 ("Quite simply, there is no

allegation of duty owed to anyone.").)  As plaintiff notes,

however, it did provide in its complaint that the

> Greater Southeast Health Care Providers engaged
> [defendant] as their certified public accountants to
> provide accounting and auditing services  . . . within
> the professional standards of care.  In performing its
> audit and accounting services for Greater Southeast,
> PWC had a duty to exercise appropriate care and
> competence within the professional standards of care.
> The professional standards of care for [defendant]
> included its national, regional, and local expertise in
> the health care auditing field.

(Compl. ¶ 53; see also Pl.'s Opp'n at 14-15.)  Defendant nowhere

contests that the alleged standard of care is legally

inappropriate, or that there is no legal duty that would flow

from an auditor to an audited party.  Indeed, defendant seems to

concede that there may be "duties that arise between auditor and

audit client[,]" albeit "complicated" ones.  (Def.'s Mot. at 18.)

Plaintiff also offers that defendant owed Greater Southeast

a duty of care based on "engagement letters [which] provided that

[defendant's] audit and other accounting work would be performed

in compliance with applicable professional standards of care,

including the GAAS."  (Pl.'s Opp'n at 15 (citing Compl. ¶ 60).)

In effect, plaintiff alleges that defendant contracted to perform

for Greater Southeast auditing activities in accord with a set

standard of care.  See, e.g., High v. McLean Financial Corp., 659

- 24 -

F. Supp. 1561, 1570 (D.D.C. 1987) ("In the face of defendant's
alleged acceptance of a duty toward plaintiffs, . . . the Court
cannot find that no duty existed."); cf. Asuncion v. Columbia
Hosp. for Women, 514 A.2d 1187, 1191 (D.C. 1986) (noting that the
same duty of care controls negligence and breach of contract
claims premised on the same or similar set of facts).  Those
facts as alleged are adequate to set forth a duty of care owed by
defendant to Greater Southeast.

      2.   Breach of the Duty of Care

Defendant also claims that plaintiff has not specified which
"professional services are the subject of the complaint," "which
financial statements are the basis for the claim," "which
financial statements of the Greater Southeast entities by
[defendant] are implicated," and what financial statements, if
any constitute "material misstatements."  (Def.'s Mot. at 18-23.)
Defendant asserts that the negligence claim must be dismissed
because plaintiff has failed to allege any negligent conduct on
the part of the defendant.

Plaintiff alleges that defendant "planned and performed
annual audits of the financial statements of the Foundation and
Hospital during the 1990's" and furnished "audit letters" for the
Foundation and Hospital (Compl. ¶ 19), but that "[c]ontrary to
[defendant's representations in its] audit letters for years 1995

through 1997, inclusive, the audits of the Foundation and
Hospital were not conducted in accordance with GAAS." (Id. ¶ 23
(emphasis in original).) Plaintiff adds that "the financial
statements of the Foundation and Hospitals contained material
misstatements and were therefore not in conformity with GAAP."
(Id.) Plaintiff commits 28 paragraphs over eight pages in its
complaint to set forth the nature of defendant's alleged
negligence in preparing financial statements: despite
defendant's purported understanding of Greater Southeast's
accrued net revenue procedures, defendant failed to account for
the "net realizable value" of Greater Southeast's accounts
receivable balances and painted a "falsely positive picture of
the [Greater Southeast's] financial position." (Compl. ¶ 26; see
also id. ¶¶ 24-51.) Plaintiff specifically contends that
defendant committed audit malpractice "in years 1995 through 1997
when auditing accounts receivable balances in the financial
statements which were materially misleading" and by failing
appropriately to "study and test the System's internal controls
with respect to the patient accounts receivable and net patient
service revenue." (Id. ¶¶ 27, 28.) At the least, plaintiff
identifies the audit letters for 1995 through 1997 prepared for
the Foundation and the Hospital of Greater Southeast as
negligently performed services which form the basis for

plaintiff's complaint.  Plaintiff further specifies that the
audit valuations for 1995 through 1997 materially misstated the
net operating income of Greater Southeast by "the approximate
amount of $27 million[.]"  (Id. ¶ 48.)

Although defendant asserts that "when financial statements
are alleged to contain material misstatements, the complaint is
expected to identify the financial statement, the misstated
item(s), and the amount of the misstatement" (Def.'s Mot. at 20),
defendant cites as support case law analyzing the sufficiency of
a claim under Section 10(b) of the Securities and Exchange Act of
1934, a claim that plaintiff does not make here.  One of the
essential elements of a 10(b) claim includes the existence of a
material misstatement or omission in connection with the purchase
or sale of a security upon which the plaintiff detrimentally
relies.  See Holzman Trust v. Coopers & Lybrand, LLP, et al.,
Nos. 95-677, 678, 1998 U.S. Dist. LEXIS 14535, at *12 (D.D.C.
Sept. 11, 1998).  Holzman held that the plaintiff's complaint
lacked the specific "who, what, when and where of the fraud" and
did not meet the requirement for particularity of pleading for
fraud claims under Federal Rule of Civil Procedure 9(b), even
when read in light of Rule 8's liberal pleading standards.  Id.
at *23.  Because the plaintiff there simply set forth allegations
that the defendant's financial audits "falsely portrayed a

- 27 -

favorable picture of the District's financial position" without identifying what accounting principle under GAAS or GAAP was violated or "what the accountant saw and ignored[,]" id. at *17, 19, the court held that the conclusory allegations were not well pled and dismissed the claims.

In contrast, plaintiff's cause of action here does not have as an essential element a material misstatement made by the defendant.  Instead, the material misstatements are identified as the result of the breach of the defendant's duties.  An essential element of the negligence claim is not the material misstatement per se, but the breach of a duty of care.  In any event, plaintiff here, unlike the plaintiff in Holzman, identifies specific GAAS provisions which were violated (Compl. ¶ 41 (identifying 14 GAAS provisions)), and explicitly calculates and alleges in "what respect these numbers were wrong."  Holzman, 1998 U.S. Dist. LEXIS 14535, at *23.  At a bare minimum, plaintiff's allegations "disclose[] a possible violation of law" which, if proven true, may show that plaintiff is entitled to relief under a theory of negligence.[9]  Warren, 353 F.3d at 39, 40

---

[9]    Defendant also argues that the complaint fails to allege that the accounts receivable estimates were without reasonable basis.  (Def.'s Mot. at 22.)  Even assuming that such an allegation is required, plaintiff sets forth why the accounts receivable estimates were allegedly wholly wrong and negligently calculated based on a failure to make net realizable value

(noting also that a plaintiff's negligence allegation is a mixed question of law and fact which is treated as a factual issue for the purposes of Rule 12(b)(6) and accepted as true).

### 3.   Proximate Causation

Citing Mount v. Baron, 154 F. Supp. 2d 3, 9-10 (D.D.C. 2001) as support, defendant also contends that plaintiff's failure to allege that the $70 million in damages was caused by defendant's conduct is fatal to the negligence claim.  (Def.'s Mot. at 24.) Defendant asserts that plaintiff alleges merely that the Board of Trustees would have been enabled to thwart bankruptcy if defendant had not negligently conducted its audits, not that the Board would have done something that would have avoided insolvency, making the allegation inadequate to allege proximate causation.  (Id. at 24, 25)

Contrary to defendant's assertion, plaintiff did indeed allege that "[t]he Board of Trustees would have taken actions to avoid insolvency and bankruptcy" if it had been "timely alerted by appropriately audited financial statements to the fact that the System was performing significantly worse than was presented in the negligently audited financial statements . . . ."  (Compl. ¶ 51 (emphasis added).)  Instead, the complaint contends, "as a

calculations.  If proven true, plaintiff's allegations could show that the estimates were without reasonable basis.

- 29 -

proximate result of [defendant's] audit malpractice, the
Foundation experienced insolvency and bankruptcy." (Id. ¶ 56.)
Plaintiff adequately alleges that defendant's purportedly
negligent audit reports caused, in part, the Foundation's
bankruptcy and approximately $70 million in damages. Because
conclusory allegations of fact are accepted as true, as are mixed
questions of law and fact, plaintiff has provided an adequate
short and plain statement which if proven could result in
defendant's liability for negligence. Warren, 353 F.3d at 39,
40; see also High, 659 F. Supp. at 1570 (finding adequate a
plaintiffs' claim that a bank's failure to process their loan
application proximately caused their failure to secure a loan for
the same amount of money with the same interest rate); cf.
Ashford v. District of Columbia, 306 F. Supp. 2d 8, 15-16 (D.D.C.
2004) (finding adequate a plaintiff's allegation that his
injuries were caused by alleged police custom not to relay
prisoner separation orders).

Mount v. Baron, cited by defendant, does not change the
analysis. In Mount, the court found a plaintiff's allegations of
vague and general failures insufficient to establish a causal
link between the plaintiff's injuries and defendant's alleged
breach of duty. 154 F. Supp. 2d at 9. There, plaintiff claimed
that his counsel committed legal malpractice in the course of

litigation by failing to add defendants to the amended complaint
and by dropping others.  Because the plaintiff did not plead
facts establishing causation "between the jury's verdict and the
failure to keep or re-add defendants and claims[,]" namely, by
failing to "identif[y] how these additional defendants and claims
would have resulted in a verdict more favorable to the
plaintiffs," id., the court dismissed the negligence claim.

The critical omission in Mount was the plaintiff's failure
to allege that the defendant's action or failure to act caused
his injuries.  The omission of detailed facts on what trial
strategy would have been used but for the defendant's failure to
act was not the ground for dismissal.  Here, defendant argues
that the absence of detail as to what the Board of Trustees would
have done to avert bankruptcy is a dispositive omission.
However, the omission of detail does not render inadequate
plaintiff's allegation that "as a proximate result of
[defendant's] malpractice, the Foundation experienced insolvency
and bankruptcy" (Compl. ¶ 56), which would have been avoided but
for defendant's purportedly negligent work.  (Id. ¶ 55.)  That
allegation may be sufficient to establish, if proven, a causal
link between defendant's failure to audit correctly Greater
Southeast's financial reports, and bankruptcy.

4.   Damages

Finally with respect to the negligence claim, defendant deems plaintiff's claim for $70 million in damages inadequate without allegations as to "how this amount was calculated or what it represents."  (Def.'s Mot. at 24.)  Defendant argues that "plaintiff must necessarily reveal more than this up front" so as to give some "remote clue as to what this number [$70 million] represents."  (Id.; Def.'s Reply at 13.)  Under the liberal pleading requirements of Rule 8, however, plaintiff's allegation that defendant's breach of its duty of care proximately caused "insolvency and bankruptcy" and "compensatory damages [which are] continuing" is sufficient.  See, e.g., Fed. R. Civ. P. Form 9 (citing as exemplary claim that plaintiff "suffered great pain of body and mind, and incurred expenses for medical attention and hospitalization in the sum of one thousand dollars" without additional details).  Plaintiff also specifies that the damages caused by defendant's audit malpractice and ensuing insolvency and bankruptcy totaled "approximately seventy million dollars, exclusive of pre-judgment interest, the costs of suit, and such other and further relief as the Court may determine appropriate." (Compl. ¶ 57.)  That representation is adequate to allege the damages factor of a negligence claim.

B.   Breach of Contract

Defendant also argues that the breach of contract claim should be dismissed for the same reasons set forth in its motion to dismiss the negligence claim.  Because defendant proffers no other grounds to dismiss the contract claim and because the negligence claim survives, defendant's motion to dismiss the breach of contract claim will be denied.[10]  See, e.g. Macktal v. Garde, 111 F. Supp. 2d 18, 22-23 (D.D.C. 2000) ("[A]lthough contract and tort claims arising out of the same incident theoretically have different requirements of proof and assessments of damages, as well as different rules governing assignability of claims and periods of limitation, we have noted that, in professional malpractice cases, alleged negligence and breach of contract are typically premised on the same duty of care and, as a consequence, should typically lead to the same legal result.") (quoting Asuncion, 514 A.2d at 1190 ).

IV. CONTRIBUTORY NEGLIGENCE

Defendant argues that "[w]here the audit client, as plaintiff, alleges that the financial statements it prepared were materially inaccurate, the audit client does not have a general

_____

[10]   Plaintiff contests defendant's claim that the breach of contract claim fails to the extent that the negligence claim fails.

claim against the outside auditing firm for damages." (Def.'s
Mot. at 39.)  Defendant contends that, as a corollary of the
plaintiff's contributory negligence acting as a bar to recovery
in the District of Columbia, "[t]he responsibility of the audit
client for fair presentation of the financial statements greatly
restricts the type of claim that an audit client may bring
against the outside auditor[,]" citing In re River Oaks
Furniture, Inc., 276 B.R. 507, 517 (N.D. Miss. 2001).  (Id. at
39, 41.)  Plaintiff counters that the "majority rule is that the
negligence of a client is a bar 'only if it is unreasonable under
the circumstances and interferes with the accountant's ability to
perform his duty'" (Pl.'s Opp'n at 32 (citing Nat'l Surety v.
Coopers & Lybrand, 9 N.Y.S. 2d 554 (App. Div. 1939)), that the
River Oaks line of cases applies only if the audited party
committed fraud and affirmatively knew about the material
misstatements it was making (id. at 39-43), and that Greater
Southeast's conduct was not unreasonable or did not contribute to
its injury.  (Id. at 43.)

        Regardless of whether defendant's River Oaks or plaintiff's
National Surety analysis is the controlling law of the District
of Columbia, plaintiff is entitled to have its facts construed in
the light most favorable to the plaintiff and the court must
assume the truth of well-pleaded allegations.  Plaintiff argues

that "Greater Southeast's conduct was not unreasonable, or that,
if it were, it did not contribute to this injury. . . .  The
issue quite clearly cannot be determined on a motion to dismiss."
(Pl.'s Mot. at 43.)  At this stage, because plaintiff asserts
that Greater Southeast provided documents "to the best of [its]
knowledge and belief" which may not have been materially
misstated, dismissal would be premature.  With the benefit of all
reasonable inferences, plaintiff has set forth sufficient facts
to maintain its claims.

V.   STATUTE OF LIMITATIONS

    Defendant also argues that plaintiff's claims are barred by
the statute of limitations.  It asserts that any tolling
agreement signed between defendant and the "Official Committee"
is void and relevant to only the creditors' committees' claims,
and that the discovery rule would have required plaintiff to be
on notice of its claims more than three years before it filed its
complaint.  Plaintiff argues in opposition that defendant's
claims are premature for a motion to dismiss, that the tolling
agreements made the Plan Committee -- as the successor to the
Official Committee -- a party to the tolling agreements, and
arguing that factual disputes remain with respect to the
discovery rule.

- 35 -

Under District of Columbia law, the period of limitations for actions in contract is three years.  12 D.C. Code § 301(7). "Generally, accrual for contract cases occurs when the contract is first breached."  Capital Place I Assoc. L.P. v. George Hyman Constr. Co., 673 A.2d 194, 198 (D.C. 1996).  A three-year statute of limitations applies for torts.  Kuwait Airways Corp. v. Am. Security Bank, N.A., 890 F.2d 456, 460 (D.C. Cir. 1989).  "What constitutes the accrual of a cause of action is a question of law; the actual date of accrual, however, is question of fact." Cevenini v. Archbishop of Washington, 707 A.2d 768, 770-71 (D.C. 1998).  "Where the fact of an injury can be readily determined, a claim accrues at the time that the plaintiff suffers an alleged injury."  Hendel v. World Plan Exec. Council, 705 A.2d 656, 660 (D.C. 1997).

In cases where "'the relationship between the fact of injury and the alleged tortious conduct [is] obscure,' this court determines when the claim accrues through application of the discovery rule . . .."  Doe v. Medlantic Health Care Group, Inc., 814 A.2d 939, 945 (D.C. 2003).  "The discovery rule was developed to redress situations in which the fact of injury was not readily apparent and indeed might not become apparent for several years after the incident causing injury had occurred."  Farris v. Compton, 652 A.2d 49, 55 (D.C. 1994).

In determining whether the discovery rule is applied to a cause of action, the District of Columbia has articulated four factors: "(1) the justifiable reliance of a plaintiff on the professional skills of those hired to perform their work; (2) the latency of the deficiency; (3) the balance between the plaintiff's interest in having the protection of the law and the possible prejudice to the defendant; and (4) the interest in judicial economy."  Kuwait Airways Corp., 890 F.2d at 461 (citing Woodruff v. McConkey, 524 A.2d 722 (D.C. 1987)).  The discovery rule is applicable "in those cases in which 'the relationship between the fact of injury and the alleged tortious conduct is obscure.'"  Hendel, 705 A.2d at 660 (citing Bussineau v. Pres. & Dirs. of Georgetown College, 518 A.2d 423, 425 (D.C. 1986)). Further, the District of Columbia "has extended the discovery rule to many classes of cases, including medical, legal and architectural malpractice actions and products liability actions where the injury is a latent disease, but has declined to declare the rule applicable in all cases."  Diamond v. Davis, 680 A.2d 364, 380 n.15 (D.C. 1996) (citation omitted).

When the discovery rule applies, a cause of action accrues when the plaintiff knows or by the exercise of reasonable diligence should know "(1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing."  Bussineau, 518 A.2d at

425.  Further, "it is only necessary that the plaintiff have
inquiry notice of the existence of a cause of action" for the
statute of limitations to begin to run.  Ray v. Queen, 747 A.2d
1137, 1141 (D.C. 2000).  Therefore, "a plaintiff can be charged
with inquiry notice of his claims even if he is not actually
aware of each essential element of his cause of action."
Cevenini, 707 A.2d at 771.  "The fact that [the plaintiff] did
not then comprehend the full extent of all [elements] does not
matter, for the law of limitations requires only that [it] have
inquiry notice of the existence of a cause of action . . .."
Colbert v. Georgetown Univ., 641 A.2d 469, 473 (D.C. 1994)
(citation omitted).

Inquiry notice is the standard for all cases in which the
discovery rule applies "regardless of the presence or absence of
fraud, or the characterization of that fraud."  Diamond, 680 A.2d
at 380-81.  "The critical question in assessing the existence *vel
non* of inquiry notice is whether the plaintiff exercised
reasonable diligence under the circumstances in acting or failing
to act on whatever information was available to him."  Ray, 747
A.2d at 1141-42.  Whether a plaintiff exercised reasonable
diligence is a highly fact-bound issue and requires an evaluation
of all of the plaintiff's circumstances.  See Diamond, 680 A.2d
at 372.  "The relevant circumstances include, but are not limited

to, the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations."  Id.  "The Court employs an objective standard in evaluating whether the [plaintiff was] on inquiry notice."  Jacobsen v. Oliver, 201 F. Supp. 2d 93, 109 (D.D.C. 2002).  "Thus, although summary judgment on the issue of when accrual occurred may be granted in cases when there is no disputed issue of fact, we have held that summary judgment is improper when there is a disputed question about the plaintiff's diligence in investigating a possible cause of action."  Medlantic, 814 A.2d at 945.

Where, as here, there are factual disputes regarding the language of the tolling agreements, who the parties to the tolling agreements are, whether Greater Southeast relied on defendant's representations with respect to the tolling agreements, and the date on which the action accrued, summary judgment or dismissal would be improper.

CONCLUSION

Plaintiff has standing to sue, but lacks capacity to sue, and will be permitted to join plaintiffs with proper capacity. Plaintiff has set forth a cause of action for negligence and breach of contract.  The unsettled and undeveloped factual record

- 39 -

precludes dismissal based upon contributory negligence or statute

of limitations grounds.  Accordingly, it is hereby

ORDERED that defendant's motion to dismiss [12] be, and

hereby is, DENIED.  It is further

ORDERED that plaintiff file within 30 days of the date of

this Order an amended complaint joining as plaintiffs parties

with the capacity to sue.

SIGNED this 31st day of August, 2005.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge